[Civ. No. 24137. Second Dist., Div. One. May 27, 1960.]

THOMAS THATCHER, as Superintendent of Insurance of the State of New York, Appellant, v. CITY TERRACE CULTURAL CENTER (a Corporation), Respondent.

Arthur S. Ecker, Hill, Greenberg & Glusker and Arthur N. Greenberg for Appellant.

Margolis & McTernan and Ben Margolis for Respondent.

LILLIE, J.—Plaintiff, whose predecessor as Superintendent of Insurance of the State of New York had theretofore been

appointed liquidator of International Workers Order, Inc., a corporation organized as a fraternal benefit society under New York law, brought this action as liquidator to require a conveyance by defendants of California property assertedly covered by the order of dissolution rendered by the New York court. Defendant City Terrace Cultural Center is a California corporation holding record title to certain realty in the city of Los Angeles; defendant City Terrace Lodge 253, an unincorporated association, is a subordinate or local lodge of International; the remaining defendants are individual officers and members of the subordinate lodge. The appeal is from a judgment of dismissal entered after the trial court sustained without leave to amend the demurrer of defendant City Terrace Cultural Center to the second amended complaint and also granted motions to strike certain portions of that pleading.

The following is a summary of the second amended complaint:

### First Cause of Action

#### I.

Plaintiff sues in his capacity as Superintendent of Insurance of the State of New York and as liquidator of the I.W.O. Defendant corporation is a California corporation. Defendant lodge was an unincorporated association and subordinate local lodge of the I.W.O. The individual defendants were members of defendant lodge.

#### II.

The I.W.O. was a fraternal benefit insurance society organized under the laws of New York and authorized to conduct an insurance business through local lodges in various states including California.

#### III.

On or about December 15, 1950, the Supreme Court of the State of New York issued an order directing the I.W.O. to show cause why an order should not be entered directing the Superintendent of Insurance to take possession of the property of the I.W.O. and to liquidate its business pursuant to New York Insurance Law.

#### IV.

Trial was held and on August 24, 1951, an order was entered by the Supreme Court of New York granting the petition. The court ordered dissolution of the I.W.O. and

forfeiture and annulment of its charter and directed the Superintendent of Insurance to liquidate the business of the I.W.O., which liquidation provisions were stayed pending appeal.

V.

After trial, on August 24, 1951, the Supreme Court of the State of New York ordered dissolution of the I.W.O. and directed the Superintendent of Insurance to liquidate its business. On July 26, 1954, a further order was made by the Supreme Court fixing midnight, August 31, 1954, as the effective date of the order of liquidation. Said order has become final and is now in effect and said Superintendent of Insurance as liquidator became and is entitled to ownership and possession of all the assets of the I.W.O. and of its lodges.

VI.

The assets and property of each lodge belonged to the I.W.O. and upon dissolution of the I.W.O., the Superintendent of Insurance as liquidator became entitled to possession of all the assets and property of each lodge.

VII.

Defendant lodge became a branch of the I.W.O. on or about April 1, 1940, and was a local branch or lodge of the I.W.O. at all times mentioned in the second amended complaint.

VIII.

On or about September, 1945, defendant lodge caused defendant corporation to be incorporated. Defendant lodge purchased certain real property in the name of defendant corporation and defendant corporation held legal title to said real property in trust for defendant lodge and for the I.W.O.

IX.

On or about December 15, 1953, the Superintendent of Insurance ordered dissolution of all local lodges and directed all local lodges to forward all of their assets to him. Defendant corporation and defendant lodge have failed and refused to deliver title to said real property to said Superintendent of Insurance. The Superintendent of Insurance is entitled to possession of said real property and the failure of defendants to deliver possession has resulted in damage to said Superintendent in the sum of Ten Thousand Dollars ($10,000.00).

## X.

Said Superintendent of Insurance is entitled to an accounting by defendant of all income and profits received by them which belong to the I.W.O.

### Second Cause of Action

#### I.

Certain paragraphs of the First Cause of Action were incorporated by reference.

#### II.

The order of the Supreme Court of New York dissolved the I.W.O. and directed the Superintendent of Insurance to take possession of the property and to liquidate the business of the I.W.O. Defendant lodge is bound by the constitution and by-laws of the I.W.O. which state that all the property of each lodge is the property of the general office of the I.W.O.[1]

#### III.

On or about September 21, 1945, defendant lodge caused defendant corporation to be formed to take title to said real property. Defendant corporation is a nonprofit membership corporation incorporated by defendant lodge for the sole purpose of holding naked title to said real property and defendant lodge has governed, controlled and managed said defendant corporation for the benefit of defendant lodge. Defendant corporation is the *alter ego* of defendant lodge.

### Third Cause of Action

#### I.

Certain paragraphs of the preceding causes of action were incorporated by reference.

#### II.

At the effective date of the order of liquidation, the Superintendent of Insurance became vested with title to said real property and ever since said date the Superintendent has been and now is the owner of said real property and entitled to possession thereof.

---

[1]Section 66 of the Constitution and By-Laws of the International Workers Order, Inc., pleaded in *haec verba*, reads as follows: "'If a lodge votes to dissolve or if it is dissolved by order of the General Council, then all its property, funds, documents, supplies, seals, records, etc. of whatsoever kind, nature or description, all of which are hereby declared to be the property of the General Office of the I.W.O. shall be immediately forwarded to the General Secretary-Treasurer.'"

## III.

Defendants claim to have some right, title and interest or estate in said real property which claims are without right.

The second amended complaint prays for judgment quieting title to said real property, for damages in the sum of $10,000, for an accounting and for other relief.

None of the defendants were named as parties in the New York proceedings; also, while certain individual members intervened therein and were represented throughout by counsel, the reported decisions pertaining thereto make no mention of any such appearance by California members of the society (*Application of Bohlinger,* 106 N.Y.S.2d 953; aff'd 113 N.Y.S.2d 755; aff'd 305 N.Y. 258 [112 N.E.2d 280]; cert. den. 346 U.S. 857 [74 S.Ct. 68, 98 L.Ed. 371], 346 U.S. 913 [74 S.Ct. 237, 238, 98 L.Ed. 409]), and it is conceded (unless we permit an amendment to the pleading) that formal notice of the New York proceedings was not given any of the defendants at bar. In its minute order sustaining the demurrer, therefore, the trial court cited California cases and a text writer and indicated the following reasons for its action: (1) as to counts one and two, the present suit, if countenanced, would result in a denial of due process by virtue of inadequacy of notice and an opportunity for hearing, thus working a forfeiture of the property involved; (2) as to count three, plaintiff as a foreign liquidator had no right to bring the action in California to recover California assets (particularly since they consisted of realty) because the rights of local creditors would be prejudiced (Goodrich, Conflicts of Laws (3d ed.), p. 597).

With respect to (2) just mentioned, it has been said that a foreign receiver or liquidator of an insurance company vested with title to the assets of the company by the law of the domicile of the company ordinarily is entitled to assert such title in the courts of other states (44 C.J.S. "Insurance" § 133(2).) Since he has such title he has the right and duty to collect the assets situated in other states and he may sue in the courts of such other states to collect such assets as a matter of right and not merely by comity" (§ 133(2), *supra*). The foregoing rule is recognized in California (*Seth* v. *Lew Hing,* 125 Cal.App. 729, 733-734 [14 P.2d 537, 15 P.2d 190]); and again, in *Wright* v. *Phillips,* 60 Cal.App. 578 [213 P. 288], where it was sought to set aside a conveyance of realty, the court acknowledged the right

of a foreign receiver to bring such action in California, unless the interests of local creditors would be prejudiced, declaring that "(t)he policy of this state conforms to the generally recognized rule under which the plaintiff properly claims the privilege of maintaining his action (citation)." (P. 580.) See also *Canfield* v. *Scripps*, 15 Cal.App.2d 642, 647 [59 P.2d 1040]. At this preliminary stage, from the face of the complaint, it does not appear that prejudice would be done to any local creditors unless (as they suggest) defendants themselves might be placed in that category by becoming obligated to pay the expenses of the receivership; however, the rule seems to contemplate creditors who have asserted a claim by way of execution or attachment (*Lackmann* v. *Supreme Council O. C. F.*, 142 Cal. 22 [75 P. 583]) and not persons in defendant's present position. Whether plaintiff was in fact vested with title to the assets of the society under the circumstances alleged is, of course, another consideration—perhaps the decisive one at bar.

 "It appears to be settled law that the effect of the dissolution of a corporation, or its expiration otherwise, depends upon the law of its domicile (Rest., Conflict of Laws, pp. 228-229, § 158; 20 C.J.S., pp. 128-129, §§ 1899, 1900); and that a defunct foreign corporation has no greater capacity or higher standing to commence or maintain an action in the state of the forum than it would have in the state of its domicile (citations)." (*Fidelity Metals Corp.* v. *Risley*, 77 Cal.App.2d 377, 381 [175 P.2d 592].) Section 158 of the Restatement, *supra*, provides: "If a corporation is dissolved by the state of incorporation, another state will recognize that the association has been deprived of the legal attributes of incorporation; and if the exercise of powers incident to incorporation is suspended by the state of incorporation, this suspension will be effective in another state." Comment (a) to section 158 states: "a. The method of dissolution or suspension is a question for the state of incorporation, but the courts of another state will inquire whether there has been such a compliance with the prescribed method as to render the dissolution or suspension a valid one, unless the question has already been passed upon by the state of incorporation." As already noted, the validity of the dissolution proceedings has previously been sustained (without dissent, we observe) by the New York intermediate appellate court (113 N.Y.S.2d 755), and that state's Court of Appeals

(305 N.Y. 258 [112 N.E.2d 280]); such determination is therefore binding on a California court.

We next consider the legal effect of the parent's dissolution upon its subordinate bodies; specifically, whether the New York decree transferred title to all the property of local lodges consistent with due process. In this connection we must accept as true for the purposes of this appeal not only the allegation that defendant City Terrace Lodge is such a subordinate, but all other issuable facts well pleaded (*Katenkamp v. Union Realty Co.*, 6 Cal.2d 765, 769 [59 P.2d 473]). Preliminarily, the language of the New York law (New York Ins. Law, §§ 450, 451) pertaining to fraternal benefit societies is in several respects almost identical with that employed by the statutes of California. (Ins. Code, § 10970 et seq.) In this state a fraternal benefit society is defined as one "conducted solely for the benefit of its members and their beneficiaries and not for profit, operated on a lodge system with ritualistic form of work, having a representative form of government, and which makes provision for the payment of benefits in accordance with this chapter . . ." (Ins. Code, § 10990); also when it has "a supreme legislative or governing body and subordinate lodges or branches by whatever name known, into which members are elected, initiated or admitted in accordance with its constitution, laws and ritual, which subordinate lodges or branches shall be required by the laws of the society to hold regular meetings at least once in each month, (it) shall be deemed to be operating on the lodge system" (Ins. Code, § 10991). The organizational and asset structure of I.W.O. is thus described by the New York trial court (*Application of Bohlinger*, 106 N.Y.S.2d 953, 959): "The I.W.O.'s principal office is in New York City. It is comprised of about sixteen hundred individual lodges, many of which are grouped in the national language societies which form unincorporated subdivisions of the I.W.O. These lodges are located throughout the United States. The I.W.O. is licensed in seventeen other states and the District of Columbia. In December, 1949, it had a membership of about 162,000 and over $6,000,000 in assets. These assets included over $500,000 in cash and investment in government bonds amounting to more than $5,000,000. The organization writes life, accident and health insurance. It had in force on December 31, 1949, insurance amounting to more than $110,000,000 and had paid out up to that time more than $13,000,000 in benefits. It is concededly solvent and in sound financial condition at this time" (Despite its "sound financial condition,"

*supra,* cogent reasons are given by the New York trial court and by the Court of Appeals for the determination that further operation of the I.W.O. would prove hazardous and contrary to law).[2]

Although a court "having jurisdiction of the parties may adjudicate their rights to land located in another state" (*Barber* v. *Barber,* 51 Cal.2d 241, 244, 247 [331 P.2d 628]), without such jurisdiction the enforcement of a judgment in one state attempting to operate upon real property in another will not be compelled by the full faith and credit clause of the United States Constitution (*Launer* v. *Griffen,* 60 Cal.App.2d 659, 667 [141 P.2d 236]). In *Scott* v. *Donahue,* 93 Cal.App. 126, 130 [269 P. 455], involving a dispute between a parent fraternal society and its local lodge, the court quoted from *Grand Grove etc. Order of Druids* v. *Garibaldi Grove etc. Order of Druids,* 105 Cal. 219, 224, 225 [38 P. 947] : "Whoever would claim the right to deprive another of property or privilege, without giving him an opportunity to defend the same, must show some consent on his part to such action." Appellant maintains, assuming the validity of his *alter ego* argument,

---

[2] Said the trial court: "It has already been observed that over 97% of the order's assets are in the form of cash and government bonds. Obviously there is nothing wrong or sinister about liquid assets as such. Nevertheless, one desiring to misappropriate assets can do so more easily if they are liquid. It would appear, therefore, that since the I.W.O. is dominated and controlled by the Communist Party and that the responsible officers of the I.W.O. are active Communist Party members and that the assets of the I.W.O. are liquid, there is a substantial financial hazard, potential if not otherwise. If the time arrives when there is a conflict between the interests of this country and the world of Communism, it is not beyond the realm of reasonable probability that the funds of this Order will be expropriated. In the light of the overall picture as this court sees it and taking into consideration the activities of the order over a period of twenty years, the conclusion is irresistible that the present situation presents a definite hazardous position in which the I.W.O. finds itself from the standpoint of its policyholders, the creditors and the public within the meaning of the appropriate provisions of the Insurance Law." (106 N.Y.S.2d 953, 979-980.)

Sustaining the lower court's action, the Court of Appeals declared: ". . . the term 'hazardous' contrary to the assertion of the Superintendent of Insurance, encompasses only dangers financial in nature. In our view, however, the record supports the conclusion that further operation of the I.W.O. would prove 'hazardous' in a financial sense . . . there can be no question that the I.W.O.'s continued course of political action, involving as it did financing Communist Party organizers and publications disseminating Party literature, and supporting Communist policies and candidates for public office, violates the I.W.O. charter as well as the laws of this state and, therefore, permits liquidation under section 511(f). These activities, carried on for almost two decades with the active support of the membership, were unauthorized by the Order's charter and, perhaps, even contravened its express provisions." (305 N.Y. 258 [112 N.E.2d 280].)

that the local consented to jurisdiction in the New York court by its assumption of membership in International and that a contract was thereby created between the parties; therefore (it is contended), since International was organized under New York law, we must look to the statutes and decisions of that state to determine the nature and extent of the decree in the dissolution proceedings.

"The constitution and by-laws of a fraternal order of this nature constitute a contract between the parent order and the subsidiary court and the members thereof" (*Subsidiary High Court of A.O.F.* v. *Pestarino,* 41 Cal.App. 712, 714 [183 P. 297], citing *Grand Grove etc. Order of Druids* v. *Garibaldi Grove etc. Order of Druids, supra*). In *Modern Woodmen* v. *Mixer,* 267 U.S. 544, 551 [45 S.Ct. 389, 69 L.Ed. 783, 41 A.L.R. 1384], the court declared through Mr. Justice Holmes: "The act of becoming a member is something more than a contract,—it is entering into a complex and abiding relation,—and as marriage looks to domicil, membership looks to and must be governed by the law of the state granting the incorporation." The case just mentioned makes reference to *Royal Arcanum* v. *Green,* 237 U.S. 531 [35 S.Ct. 724, 59 L.Ed. 1089, L.R.A. 1916A 771], where the court was called upon to resolve a controversy between a member of a local New York lodge and the parent body chartered under the law of Massachusetts. In reaching its result, the court gave consideration to "the intrinsic relation between each and all the members concerning their duty to pay assessments and the resulting indivisible unity between them in the fund from which their rights were to be enjoyed." (P. 542.) Continuing, "(T)he contradiction in terms is apparent which would rise from holding, on the one hand, that there was a collective and unified standard of duty and obligation on the part of the members themselves and the corporation, and saying, on the other hand, that the duty of members was to be tested isolatedly and individually by resorting not to one source of authority applicable to all, but by applying many divergent, variable, and conflicting criteria. . . . It was doubtless not only a recognition of the inherent unsoundness of the proposition here relied upon, but the manifest impossibility of its enforcement which has led courts of last resort of so many states in passing on questions involving the general authority of fraternal associations and their duties as to subjects of a general character concerning all their members to recognize the charter of the corporation and the laws of the state under

which it was granted as the test and measure to be applied" (pp. 542, 543). Later on, and even more pertinent to the problem before us, the court declared: "In addition it was by the application of the same principle that a line of decisions in this court came to establish: first . . .; second, that the state law (of incorporation) and proceedings are binding as to the ascertaining of the fact of insolvency and of the amount due the creditors entitled to be paid from the subscription when collected; and third, that putting out of view the right of the person against whom a liability for a stockholder's subscription is asserted to show that he is not a stockholder, or is not the holder of as many shares as is alleged, or has a claim against the corporation which at law or equity he is entitled to set off against the corporation, or has any other defense personal to himself, a decree against the corporation in a suit brought against it under state law for the purpose of ascertaining its insolvency, compelling its liquidation . . . insofar as it determines these general matters, binds the stockholder *although he be not a party in a personal sense, because by virtue of his subscription to stock there was conferred on the corporation the authority to stand in judgment for the subscriber as to such general questions.*" (Emphasis ours.) (Pp. 543, 544.) See also *Sovereign Camp W.O.W.* v. *Bolin*, 305 U.S. 66 [59 S.Ct. 35, 83 L.Ed. 45, 119 A.L.R. 478]. In summary, "It is often stated that a state may legislate only with respect to events which occur within its borders, to a *status having an existence or situs therein* . . ." (3 U.C.L.A. L. Rev. 1, 11). Earlier the article points out that while "a court must have judicial jurisdiction over a person in order to render a personal judgment against him . . . (t)his requirement is usually taken to mean that there must be a substantial connection between the defendant and the forum state. A state's judicial acts will not be recognized and enforced by others when there is a lack of sufficient contact between the defendant and the forum." (P. 10.) That the respondent subordinate lodge itself recognized that its entire material existence was intertwined with International is emphasized by section 66 of the latter's constitution and by-laws (pleaded in *haec verba*, as already noted): "If a lodge votes to dissolve or if it is dissolved by order of the General Council, then all its property, funds, endowments, supplies, seals, records, etc., of whatever kind, nature or description, all of which are declared to be the property of the General Office of the I.W.O., shall be immediately forwarded to the General Secretary-Treasurer."

Pursuant to the mandate of the foregoing decisions, we now refer to the applicable provisions of the New York Insurance Law. Section 518 provides in part:

"Conduct of delinquency proceedings against insurers domiciled in this state.

"1. Whenever under the laws of this state a receiver[3] is to be appointed in delinquency proceeding[4] for an insurer domiciled in this state, the court shall appoint the superintendent of insurance as such receiver. The court shall direct the superintendent forthwith to take possession of the assets of the insurer and to administer the same under the orders of the court.

"2. As domiciliary receiver the superintendent and his successors in office shall be vested by operation of law with the title to all of the property, contracts, and rights of action, and all of the books and records of the insurer wherever located, as of the date of entry of the order directing him to liquidate a domestic insurer . . . and he shall have the right to recover the same and reduce the same to possession; . . .

"3. Upon taking possession of the assets of a delinquent insurer the domiciliary receiver shall, subject to the direction of the court, immediately proceed to conduct the business of the insurer or to take such steps as are authorized by the laws of this state for the purpose of liquidating, rehabilitating, reorganizing, or conserving the affairs of the insurer . . ."

Section 514 of the New York Insurance Law provides, inter alia:

"1. An order to liquidate the business of a domestic insurer shall direct the superintendent and his successors in office forthwith to take possession of the property of such insurer and to liquidate the business of the same and to deal with the property and business of such insurer in their own names as superintendents or in the name of the insurer as the court or justice before whom such order is returnable may direct, and to give notice to all creditors who may have claims against such insurers to present the same.

"2. The superintendent and his successors shall be vested by operation of law with the title to all of the property, con-

---

[3] The term "receiver" in this Section means "receiver, liquidator, rehabilitator, or conservator as the context may require": New York Insurance Law, section 517 (12).

[4] The term "delinquency proceeding" in this Section means "any proceeding commenced against an insurer for the purpose of liquidating, rehabilitating, reorganizing or conserving such insurer": New York Insurance Law, section 517 (2).

tracts and rights of action of such insurer as of the date of the entry of the order so directing them to liquidate . . ."

Construing section 514, *supra,* the New York Court of Appeals in *Bohlinger* v. *Zanger,* 306 N.Y. 228 [117 N.E.2d 338, 341], declared: "In liquidation, the liquidator for all practical purposes takes the place of the insolvent insurer. The liquidation order terminates the company's existence. The liquidator takes immediate possession and control of the assets and proceeds to a liquidation of its affairs. . . ." In *In re Kinney,* 257 App.Div. 496 [14 N.Y.S.2d 11], the intermediate appellate court stated at page 14: ". . . The Superintendent of Insurance is in effect a statutory receiver (citation); he is not an officer of the court and he derives his powers from an act of the Legislature. The Legislature pursuant to its powers to regulate insurance has provided that the Superintendent of Insurance supersedes the officers and stockholders of the corporation in the control of the corporate affairs. The managing body of the corporation can no longer control its action. The Superintendent of Insurance stands in the place of the managing body. . . ." In California sections 1010 et seq. of the Insurance Code deal with rehabilitation and liquidation of insurance companies in financial difficulties and, it has been said (*Carpenter* v. *Pacific Mut. Life Ins. Co.,* 10 Cal.2d 307, 332 [74 P.2d 761]), are modeled upon the New York law. The case just mentioned also stated: "It is no longer open to question that the business of insurance is affected with a public interest. The state has an important and vital interest in the liquidation or reorganization of such a business (citations). *Neither the company nor a policyholder has the inviolate rights that characterize private contracts.* The contract of the policyholder is subject to the reasonable exercise of the state's police power . . . obviously, if an insurance company gets into difficulties, something must be done to remedy the situation. Either the company must be liquidated, and its assets distributed to its creditors . . . or the business must, if possible, be rehabilitated." (Emphasis ours.) (P. 329.) Adherence to the views adopted by the courts of New York in such matters, *supra,* is thus clearly implied if not openly declared; indeed, it would be difficult to conceive of liquidation proceedings unless the liquidator had title, as well as possession, of the assets of the organization concerned. In the Carpenter case, just cited, the court had occasion to trace the history of the liti-

gation in question: "The commissioner, as already held, validly took possession of the assets of the old company on July 22, 1936. On August 11, 1936, he was validly appointed conservator, his prior acts approved, and *his title to the assets* expressly confirmed. By operation of law, pursuant to the express terms of the statute, *title to all of the assets of the old company became legally vested in the commissioner as trustee for all the creditors.* The transfer of these assets from the commissioner to the new company occurred pursuant to statutory authority and order of court." (Emphasis ours.) (P. 338.)

Still another consideration compels a conclusion adverse to that generally contended for by respondent. Not only does the Superintendent of Insurance under New York statute become vested with title by operation of law to the assets "wherever located"[5] (§ 518, *supra*) of the dissolved company, and the right of such person to the "personal property, wherever situated and whether tangible or intangible will be (universally) recognized" (Rest., Conflict of Laws, § 161),[6] but under the circumstances at bar the appellant was a statutory liquidator accorded the peculiar rights given a person in that capacity by settled decisional law. In *Relfe* v. *Rundle*, 103 U.S. 222 [26 L.Ed. 337], mention of which is made in *Caminetti* v. *Guaranty Union Life Ins. Co.*, 22 Cal.2d 759, 764 [141 P.2d 423], a contest arose between Relfe, the superintendent of insurance for the State of Missouri, who, together with a receiver appointed by him, was seeking to recover assets in the hands of an ancillary receiver appointed in Louisiana. Relfe sued for possession of these assets and it was held they belonged to him. The underlying theory upon which his rights were upheld has been followed in many of the decisions and appears in the following excerpt from the court's opinion:

"Relfe is not an officer of the Missouri State Court, but the person designated by law to take the property of any dissolved life insurance corporation of that State, and hold

---

[5]The California statute (Ins. Code, § 1011) uses the language "wheresoever situated"; providing for summary or initial seizure of the assets of a foreign corporation, the statute was upheld on the ground that the phrase "wheresoever situated" meant within the state where the court has power to act (*Rhode Island Ins. Co.* v. *Downey*, 95 Cal.App.2d 220, 239-240 [212 P.2d 965]).

[6]While no opinion is expressed in the Restatement as to whether land is likewise affected, this phase of the matter will be discussed *infra.*

and dispose of it in trust for the use and benefit of creditors, and other parties interested. The law which clothed him with this trust was, in legal effect, part of the charter of the Corporation. He was the statutory successor of the Corporation for the purpose of winding up its affairs. As such he represents the Corporation at all times and places in all matters connected with his trust. He is the trustee of an express trust, with all the rights which properly belong to such a position. He is an officer of the State, and as such represents the State in its sovereignty while performing its public duties connected with the winding up of the affairs of one of its insolvent and dissolved corporations. His authority does not come from the decree of the court, but from the statute. He appeared in Louisiana not by virtue of any appointment from the court, but as the statutory successor of a corporation which the court had in a legitimate way dissolved and put out of existence. He was, in fact, the Corporation itself for all the purposes of winding up its affairs. . . . By the charter of this Corporation, if a dissolution was decreed, its property passed by operation of law to the Superintendent of the Insurance Department of the State, and he was charged with the duty of winding up its affairs. Every policyholder and creditor in Louisiana is charged with notice of this charter right which all interested in the affairs of the Corporation can insist shall be regarded. The appellees, when they contracted with the Missouri Corporation, impliedly agreed that if the Corporation was dissolved under the Missouri laws, the superintendent of the Insurance Department of the State should represent the Company in all suits instituted by them affecting the winding up of its affairs. Relfe, therefore, became, by operation of law, the successor of the Corporation in the litigation these appellees instituted in Louisiana.''

To the same general effect are *Miller* v. *Barnwell Bros., Inc.*, 137 F.2d 257; *American United Life Ins. Co.* v. *Fischer*, 117 F.2d 811; *Wilson* v. *Alliance Life Ins. Co.*, 108 F.2d 150; *People* v. *Central Mut. Ins. Co.*, 313 Ill.App. 84 [39 N.E.2d 400]; and *Taggart* v. *Wachter, Hoskins & Russell, Inc.*, 179 Md. 608 [21 A.2d 141].

The policy reasons in support of the foregoing principle—and they are peculiarly pertinent to our case—are enunciated by the New York court in *Igel* v. *Phillips*, 183 App.Div. 220 [169 N.Y.S. 897, 899-900]: ''. . . If the superintendent of

insurance is not the liquidator of these funds, here we have many subordinate lodges over the whole country which have no liquidator. The funds on hand would seem to be at the disposal of the majority of the members of the lodge, even as against the protest of a minority. It would be practically impossible to enforce the liabilities of the Grand Lodge as against the individual members of these subordinate lodges, even when those liabilities are liabilities of the subordinate lodge as well. All claims for these funds may be presented to the superintendent of insurance by the individual members of these subordinate lodges, and can be determined by him, subject to court review. The superintendent becomes, then, the liquidator both of the Grand Lodge and the subordinate lodges, even if the ultimate right to the property be not in the Grand Lodge. It would seem to me, not only as necessary to the equitable distribution of the funds and determination of the liabilities of the Grand Lodge, but also a wiser policy than to leave the subordinate lodges wholly without a liquidator in case of the dissolution of the Grand Lodge." Continuing, "Moreover, the scheme of the Insurance Law made applicable seems to contemplate a central body, or Grand Lodge, for which these subordinate lodges are mere agencies for the collection of funds and organization of its members. Insurance Laws, Secs. 230, 231. Whether or not these subordinate lodges may create an independent fund, when the fund in question is the result of assessments made pursuant to the plan promulgated by the statute for the securing of funds for the central body, the superintendent of insurance, upon insolvency, becomes entitled to the fund for the purpose of liquidation (Insurance Law, § 63), and this is all that it is necessary here to decide."

The broad sweep of these decisions is challenged by respondent; it argues that this is not a situation involving stock companies and assessments assertedly due from the stockholders thereof and, as for the Igel case, the facts therein pleaded served to make that authority distinguishable. We do not agree with the first of the foregoing claims; as stated in *Royal Arcanum* v. *Green, supra,* 237 U.S. 531, 542, 543, the problem is one "involving the general authority of fraternal associations and their duties as to subjects of a general character concerning all their members," in which event one must "recognize the charter of the corporation and the laws of the state under which it was granted as the test and

measure to be applied." With respect to the Igel case (*Igel* v. *Phillips, supra,* 169 N.Y.S. 897), the respondent points out that the court there had before it sufficient pleading or proof relative to a contract (specifically, article 4 of the constitution) between the parent body and its subordinate lodge controlling the proportionate disposition of funds collected from members, from which the court found that "the fund, except as far as may be necessary to pay expenses, was held by the subordinate lodge in trust for the Grand Lodge, until the same should be called for by the Grand Lodge" (p. 898); in *Bohlinger* v. *Mayville Realty Co.,* 135 N.Y.S.2d 865, also cited by appellant, the agreement with the agent is set forth at considerable length. Another decision relied on by appellant, *District Grand Lodge* v. *Jones,* 138 Tex. 537 [160 S.W.2d 915], concerned a dispute between a parent lodge and its local over title to realty; more so than in the two cases just mentioned, the particulars of the compact between the respective organizations were before the court—six separate provisions of the constitution and by-laws being cited by the court in support of its determination that property acquired by the subordinate was held in trust for the superior body. We believe respondent's point is well taken, namely, that in its present state the complaint, despite the pleading of section 66 of the constitution and by-laws, falls short of the requirements necessary to establish prima facie that the demurrant (respondent corporation) held title in trust for International (or appellant as its successor) which is the theory of the first count, and the same is true of the second count which claims that appellant is entitled to possession by virtue of the asserted contractual relations between the parties. For the same reasons, the general quiet title action sought to be set up in the third count must likewise be held vulnerable to a general demurrer.

As we shall presently observe, however, the failure to plead with more particularity the society's organizational structure and its constitution appears to be the sole infirmity infecting the claims appellant asserts. If it is possible for appellant to bring himself within the ambit of the three cases successfully distinguished by respondent, he should be permitted to do so. "The question here is not one of evidence or burden of proof; it is a question of pleading. A complaint, to be sufficient, must contain a statement of facts, which, without the aid of other conjectured facts not stated shows a complete

cause of action." (*Going* v. *Dinwiddie*, 86 Cal. 633, 637 [25 P. 129].) On the other hand "the general rule must be borne in mind that unless it is palpably clear that a pleading is not susceptible of amendment so as to state a cause of action, a demurrer thereto should not be sustained without leave to amend" (*Murray* v. *Wright*, 166 Cal.App.2d 589, 591 [333 P.2d 111]). In our view, it is not wholly within the realm of conjecture that facts could be pleaded which would meet the exacting requirements which arise when it is urged that due process has not been had; too, this is not a controversy between private individuals in the strict sense, but one involving in the last analysis an insurance company which, like banks and other such companies, is charged with a public interest (*Financial Indem. Co.* v. *Superior Court*, 45 Cal.2d 395, 401 [289 P.2d 233]). Furthermore, in its decision (106 N.Y.S.2d 953), the New York trial court made repeated references to the need for protecting the public as well as the policyholders. Interestingly enough, also, the opinion by a three judge Pennsylvania court (*Bohlinger* v. *International Workers Order, Branch 3006*, 104 P.L.J. 455), involved precisely the same type of claim (except that personalty of the local was sought); mention was made of sections 102-104 of the constitution and by-laws of International (attached to the complaint as an exhibit) whereby dues and assessments were paid by members of the local lodge to International in return for which the latter obligated itself for certain life insurance and other benefits. The local's preliminary objections were ordered dismissed.

Having expressed ourselves on what appears to be the principal issue at bar, we now dispose of other contentions argued below and before this court. First, it is claimed that the appellant is seeking to enforce in California a New York judgment determining title to California realty. This is not the case. On the contrary, the New York judgment is merely being pleaded as the basis of a cause of action in California. ". . . (j)udgments or decrees, therefore, which are rendered in one state cannot of themselves affect title to lands in another. From the very nature of the property land must be governed by the *lex loci rei sitae*. But this does not mean that a decree directing a conveyance is without its effect *per se*. It may be pleaded as a basis or cause of action or defense in the courts of the state where the land is situated, and is entitled in such court to the force and effect of record evidence of the equities therein determined unless it be impeached for fraud" (*Redwood Investment Co.* v. *Exley*, 64 Cal.App. 455,

459 [221 P. 973]). If, under appropriate amendment the effect of the New York dissolution and liquidation proceedings is properly pleaded, "(t)here is no sound reason for denying a decree of a court of equity the same full faith and credit accorded any other kind of judgment" (*Rozan* v. *Rozan,* 49 Cal.2d 322, 331 [317 P.2d 11], citing *Redwood Investment Co.* v. *Exley, supra*).

 Second, under proper amendment the complaint would not run contra to the holdings in the *Keeler* v. *Schulte,* 119 Cal.App.2d 132 [259 P.2d 37]; *Supreme Lodge of the World* v. *Los Angeles Lodge No. 386,* 177 Cal. 132 [169 P. 1040] and *Ellis* v. *American Federation of Labor,* 48 Cal.App. 2d 440 [120 P.2d 79], all of which cases were cited by the trial court in the memorandum in support of its ruling. Factually, the three cases involved disputes between superior and subordinate lodges where due process was not observed; if under appropriate pleading, the effect of the New York dissolution proceeding might be what has been suggested for it in the briefs filed by appellant, there could be a "forfeiture by contract" and not without due process (*Subsidiary High Court A.O.F.* v. *Pestarino,* 41 Cal.App. 712, 714 [183 P. 297]; *Scott* v. *Donahue,* 93 Cal.App. 126, 130 [269 P. 455]). Says respondent: "(t)his whole proceeding smacks of a bureaucratic attempt to intervene in the affairs of a California corporation upon the alleged authority of a New York court and arbitrator . . ." From a practical standpoint the intervention thus claimed would not be so far reaching; true, local defendants could not dispute the legal effect of the dissolution proceedings (if properly pleaded), but it would still be open to them to assert any setoff or other demand which would appeal to a court of equity. Too, it seems only sensible that there should be but one liquidator for the protection of creditors and policy holders scattered throughout the country. As stated in *Motlow* v. *Southern Holding & Securities,* 95 F.2d 721, 725-726: ". . . experience has demonstrated that, in order to secure an economical, efficient and orderly liquidation and distribution of the assets of an insolvent corporation for the benefit of all creditors and stockholders, it is essential that the title, *custody and control of the assets be intrusted to a single management* under the supervision of one court. Hence other courts, except when called upon by the court of primary jurisdiction for assistance, are excluded from participation. *This should be particularly true as to proceedings for the* liquidation of insolvent *insurance* companies, for the reasons adverted

to by Mr. Justice Cardozo in *Clerk* v. *Willard*, 292 U.S. 112 [54 S.Ct. 615, 620, 78 L.Ed. 1160] . . ." (Emphasis added).

A final observation seems necessary with respect to respondent's claim, particularly emphasized at oral argument, that subordinate lodges are separate entities and wholly independent of their parent. In that respect we adopt the reasoning of the court in *District Grand Lodge etc. O.O.F.* v. *Jones, supra,* 138 Tex. 537 [160 S.W.2d 915, 921] : "Local lodges come into being, not as independent organizations existing solely for the benefit of their members, but as constituents of the larger organization, the grand lodge, organized for specific purposes, most of which can be accomplished only through subordinate bodies, the local lodges. They come into being to aid in the accomplishment of these purposes and then some of them pass away like their members before them. What is to become of their property? Departed members who contributed to its accumulation expected no interest in it. They have none. Membership in the lodge at the time of its death certainly should give the surviving member no individual interest in the lodge's property because he joined charged with notice of the statute declaring that whatever he contributes to the local lodge should, in the event of its death, pass to and vest in the central state organization. The property so acquired by the local lodge becomes impressed with the group purpose of a fraternal benefit society. Upon demise of such lodge the way to keep it so impressed is certainly not by deeding it to the surviving members to enjoy according to their individual desires, but can be achieved only by giving it to the central state organization, the grand lodge, for disposition in accordance with its rules and the general law governing it."

The judgment is reversed with directions to the trial court to allow appellant a reasonable time in which to amend if he so desires.

Wood, P. J., and Fourt, J., concurred.